We please the court, David Lawton on behalf of Plaintiff Appellant Food and Water Watch. Your Honor, we're asking that the district court be reversed and that this court grant summary judgment in favor of Food and Water Watch. From a 20,000 foot level, this case looks at three different issues at this point. Under the Magnuson-Stevens Act, the National Marine Fisheries Service issued a permit to a company called Kona Blue operating off the coast of the Big Island to allow for an aquaculture facility to operate in the EEZ from three miles to 150 nautical miles off the coast of the Big Island, which is about 200 plus miles from here. Under that act, the Magnuson-Stevens Fishery Conservation Act, the defendants determined that fishing, under the definition, which includes catching, taking, and harvesting, should be expanded by using dictionary definitions. Could you just don't spend all your time on this, but just address real briefly the standing argument that the government has made? Yes, Your Honor. What does the world look like if the councils here don't have permitting authority for this activity? Is it just the wild, wild west out there in those waters, or what? No, Your Honor. It wouldn't be the wild, wild west. That's the argument that's been raised by the defendants. They're saying that if there's no causation, number one, there's no addressability. I want to make sure to point out that they haven't raised injury in fact, so that's not an issue here today. The federal defendants have within their powers injunctive authority, which is to prohibit operations that impinge or impede on fishing that does go on out in the EEZ. So they do have that authority. I don't think they've said that they don't have, sorry if I'm speaking too loud, but I don't believe they've said that they don't have the authority. What they're saying is we don't know if we'll use it. Is there some, what's the best statutory site, CFR site that you can give us that says that if they don't have, it seems to me the world you've got to construct is that if they don't have the permitting authority, Kona Blue can't do this, period, right? Well, it's interesting. In front of the district court, the defendants argued, and this is for the mootness question, they argued specifically that our claims were moot because the permit would stop and then they, sorry, Kona Blue couldn't operate anymore, okay? But when we're dealing with the standing issue, they say, wait a second, if there's no permit, they can continue to operate. So on one hand, they say the permit is controlling, and on the other hand, they say it's not controlling. Yeah, I'll certainly ask them about that. I agree. There's tension there. But so what do you think is the authority that would allow, that would basically bar Kona Blue from being able to do this absent a permit? Well, absent a permit, I do think that the act itself, Madison-Stevens Act, now the question is which section, I believe it was when we cited this in our brief, I think it was 1855. But they have authority under the act itself to stop actions which impede on the fisheries, on fishing. And so they do have injunctive authority, and I don't think they've said that they don't. So it wouldn't be the wild, wild west. They could still stop this action going on, even if it's not fishing. They can say you can't be out here doing what you're doing. You're interfering with fishing, and so we can stop you. Okay, I'll ask them about that. You should move on. You've got many other points to cover on that. While we're talking about fishing, I think I'd like to focus at this point on the deference issue. I'm not sure which standard the Court is going to use, but the argument raised by the defendants is Chevron is sufficient, but they don't really go into the specifics. They say even if it's not sufficient skidmore, we can meet the skidmore test. We don't believe that the defendants can meet the skidmore test for a number of reasons. You will concede that the act has harvesting as a separate example of fishing? That harvesting is a separate example, yes. I will concede that, yes, catching, taking, harvesting are three examples of fishing. Right. I will concede that, Your Honor, yes. But I will not concede that the definition used by the federal defendants for harvesting and the expanding of using the harvest on one hand and employing the crop definition fall within the act of fishing. And a way we can look at this under the skidmore test. Well, I'd just like to understand that, because if the act includes harvesting as one of the aspects of fishing, and you say, well, it can't be a crop definition, what is it? Well, they're all similar. Catching, taking, and harvesting are all similar, and we need to look at it. So harvesting, I mean, Congress didn't put it in to all mean the same thing. Otherwise, they would have used one word. So they gave three specifics. So what's the function of harvesting in an aquaculture or in an open water sense? I'm just confused about that. Well, we have to look at it and see if it creates a contrary provision to what Congress was seeking. But it's got to mean something. It does, Your Honor. It does. But what we're saying is it doesn't mean what the defendants are saying. And what are they saying it means? Well, what they're saying is that harvesting includes aquaculture, and that falls outside of the purpose of the act. It's a fishery conservation act, and if we take the definition of harvesting, which they say it includes aquaculture, that's what they're arguing. If we then take the aquaculture and insert that word everywhere fishing is used within the act. So you're saying that they're using harvesting as the synonym for aquaculture. They are. They're saying that you take harvesting, you look at the dictionary definition of harvesting, which includes harvesting of a crop. And if you include harvesting of a crop, that includes a crop of fish. Therefore, fishing is a crop of fish. It's Monty Python-esque at best. Well, I'm just looking at the statute, let's just say the 16A definition. And it just seems to me for you to prevail, we have to read into that phrase, the catching, taking, or harvesting of fish, the added language, fish that originated in those waters, right? Yes. And that language isn't there. I don't know why we're compelled to read it in. Maybe you can just address that. Yes, Your Honor. Thank you. If you look at the purpose set forth in the Fishery Conservation Act, and this is in Section 16 U.S.C. 1801, the word fishing is used throughout that initial provision dealing with the purpose. If we include aquaculture, for instance, in Part A.3, commercial and recreational fishing constitutes a major source of employment. Move on. The activities of massive foreign fishing fleets in the waters adjacent to such coastal areas have contributed to such damage. Insert aquaculture into that definition. The activities of massive- The District Court was reluctant to do that, as I understand it. It said that what's at issue in this case was they permitted, they granted the permit for a test and recognized the agency's authority to grant the permit, but she refused to read it as a blanket rule or anything. It was a one-off decision to test whether or not the, if you want to label it aquaculture, but this kind of aquaculture could be construed or it could be consistent with the Act in terms of finding a way to increase the population of fish without exacerbating or replicating the downside of fish farming. So she said, you know, I'm having a little trouble with your jump to this permit creates some notion of equivalency to the entirety of what might be encompassed under aquaculture, which is not exactly a well-defined concept. Your Honor, in order to issue this permit, the only way that could be done, because the defendants only have authority to issue permits, which they're allowed to. Yes, I understand that. I understand that, but aquaculture is, I'm not sure who's defined aquaculture at this point. Well, aquaculture is fish farming. Okay. And I don't believe there's been a dispute on that issue. You can't get to the step that the Court is talking about now without the defendants first saying that aquaculture is fishing. Okay. They're not entitled to issue. No, I understand that generally. I'm just having a little trouble with your challenge to the concept that harvesting can't include the kind of taking, getting these fish into an adult state where they can be fished. Anyway, go ahead. I don't want to throw you off. The Act didn't set out to protect that, Your Honor. To explain it, the Act did not set out to protect fish farming. The concerns in 1976 that Congress was addressing was overfishing from foreign fleets and from national fleets as well. But isn't this what deference is about? I mean, I've been listening to you and trying to get an answer. Maybe you haven't. Many of us have got your answer out because of the questions, but I still don't get it. Why isn't this the kind of thing that it's at the very least ambiguous? Whatever deference we have with the agency, they get the tie. So there's certainly nothing there that says agriculture is not covered. There's nothing that says, I think Judge Watson questioned me about this, that says the fish have to be born there. You know, the statute doesn't say that. No, Your Honor. What we need to do is look at the test set forth in Skidmore. I think that's the test that we look at. If we're going to give any deference, we have to look at the Skidmore test. So if we do that, we have to look at, first and foremost, the care that's used by the defendants. What they have is a 1993 memo which specifically says that if this is going to take place, you have to go back to the councils and you have to amend the FMP. That didn't happen here. And what they did is they took that memo and ignored the fact that counsel who wrote that memo said, You can't just make aquaculture fishing. You have to go back to the council and have them amend the FMP. They ignored that, and they just took the 1993 memo. They wrote a 2011 memo, and that's it. We have two memos, a 1993 memo and a 2011 memo, and now we have this case. This case will be used as precedent for future aquaculture permits. That's what this will do. How can it be? I mean, they said that this is just a one-time experiment. We're not bound by it. We're not bound to repeat it. There's no change of policy. Actually, that's not. Did they publish a regulation? Well, no, they didn't. We would like them to go through that process, Your Honor. That's part of our dispute. Well, I know you'd like them to go through the process, but if they haven't, the consequences of their action are also limited. You know, you can't sort of say, well, we wish they'd gone through this process, and you've got to sort of treat it as if they had gone through the process, because it's precedential. Your Honor, they have argued that the 1993 memo and the 2011 memo created the precedent which allows for them to say that fishing is aquaculture, and they argued in front of the district court, and they conceded that they're going through the process to issue another permit. The only way they can issue another permit is if it's accepted that fishing is aquaculture. That's a rule. If they've made that determination, and this goes to the NEPA question, it's a precedent. There's growth-inducing impacts, and they haven't been addressed in any way at all. They essentially are saying, look, we've said that fishing is aquaculture, but there's no precedent. Even though we've done this permit, it's a one-time permit, but we're going to do it again. Well, the only way they can do it again is if they rely on the fact that they've done it once before and the 2011 memo and the 1993 memo. Why is that? We'll take a look at that when that case comes up. Why is that? You know, you're sort of anticipating the only way they can do it, but we don't know. We don't know. We'll be here, you know. You can challenge the next one. And if that's what they do, then you have a stronger case. Well, that goes to the capable of repetition yet evading review. The permit's a one-year permit. They put the fish in these aqua. But we'll know more the next time. For example, do we know whether or not they relied on this action in issuing the next permit? So you're saying that we'll know more when they issue the next permit, but they already conceded that they're issuing another permit. There's no dispute about that issue. But we'll see the reasons. You're right. We will see the reasons. I don't dispute. We will see the reasons. They will be the same reasons, though, because there's no other way that they can issue a permit for aquaculture unless they say aquaculture is fishing. You have about five minutes left. Thank you. As far as the— You don't want to save it? I will save about two minutes. I would like to make sure that the Court understands that if we use the definition of aquaculture and use it— sorry, the definition of fishing, which includes aquaculture, and we put it into the Act, everywhere that fishing is used it becomes absurd. That's not what this was set forth to deal with. There's no conservation for aquaculture that was required in 1907. You're about to give an example of it being absurd, and I think you were diverted by a question. Why don't you give me an example of it being absurd? Well, I'll give you an example. Give me an example where you sort of put it in as absurd. Sure. Again, the activities of the massive foreign fishing fleets in waters— well, the purpose. The purpose is trying to deal with overfishing. It's not dealing with overaquaculture. To say that the Magnuson–Stevens Fishing Company— I'm sorry, you're not doing what you said. You said drop in the water, so you've got to give me a quote. You've got to give me an actual thing and then drop it. Do the very thing you say is so horrible. Okay. I will. I'm going to read from 16 U.S.C. 1801, Part A, 5. Fishery resources are finite but renewable. If placed under sound management before overaquaculture has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis. I inserted aquaculture for fishing. That makes it absurd. Why? Because there was no overaquaculture. This is the first—they've conceded this is the first aquaculture in the EEZ, in the history of the Magnuson–Stevens Fishery Conservation Act, since 1976, 37 years. That doesn't make it absurd. It just makes it unlikely that Congress would have said that. But if you want to substitute this in, it's not absurd. They could just say, well, you've got aquaculture and it destroys fishing. Let's say you plop one of these guys in the middle of a fishing area, it might destroy their ecosystem. It doesn't sound at all absurd to me. It sounds like it fits right in. Respectfully, I disagree, since it wasn't— Well, it's absurd to me. I mean, you know. It wasn't ongoing in 19— It may not have been ongoing, but it's not absurd. You're saying if you do it, it's absurd. Yes, Your Honor, and I'm explaining why it's absurd, because we're talking about the purpose of the act, and when we're looking at Skidmore, we have to make sure that the federal defendants, when they create an interpretation of the rule, it has to follow what Congress said. The Congress laid out what it was saying in its purpose, and if we use the aquaculture and insert it in the purpose language of the act, it falls apart. Okay. Thank you. Thank you. We'll hear from the last five. Okay. Please look forward. My name is Ellen Durkee. I'm with the U.S. Department of Justice. I represent the National Marine Fisheries Service. With me today at counsel's table is Fred Tucker from the National Marine Fisheries Service. The court should affirm the district court judgment, and although there are four issues raised by the appeal, I'd like to focus in today, and of course I'll answer any questions on any issue, but I'd like to focus in on the standing issue and the Magnuson-Stevens Act claim. The primary merits argument is on the Magnuson-Stevens Act claim, and the claim is that the service unreasonably and unlawfully concluded that this proposal by Kona Blue to engage in a short-term project involving the harvest of cultured jackfish in open ocean required a special fishing permit. Well, can I, I just don't want to get too far into the merits of the statutory interpretation issue before you address standing, so is it really your position that if we were to agree with the, if there's no permitting authority that Kona Blue could just go out there and do whatever, do whatever it wants out in those waters with no restrictions? Yes, I mean under the legal regime that we have, there is no other, this is the only permission that they needed, and what I, this case is, falls very much within the main of a third party. Hang on a second though. It's not that it's the only permission they needed, but that it's that if for whatever reason the councils don't have the authority to grant permits for this, your position is that well then anybody who wants to take a boat out there can just haul around, they can just take out however many fish they want and just drag them around for as long as they want and there's nothing the federal government? There is nothing that they have pointed to that I think would allow this. There's nothing in the Magnuson-Stevens Act that I think does what they think, they suggest that could be done. The 1855 that he mentioned talks about gear for fishing, so you have to have fishing in order to even bring that particular section under. They do like to point to 1853 subsections 812 and 814, but they leave out the start of the sentence that that is a continuation of. It says any fishery management plan with respect to any fishery, so it's as much as a government attorney I'd like to say we have plenary authority to get injunctions for anything that we think is bad. The reality is that there would have to be, you ordinarily have an unlawful activity that you're seeking an injunction for and there would have to be, but I guess it goes back, you still have, what they're saying is the council might have authority under this section to prohibit aquaculture because it affects fishery, but they're saying they haven't done that, so they're relying on a third party to do something for them. You're saying that I could just go out, as long as I'm three miles off, I could just go out there and corral off a huge section of the ocean and construct some huge fish pen, right, and just put as many fish in there as I want. I could just create all kinds of negative consequences for the surrounding waters that would damage the fish that supposedly you are trying to protect and nobody, there would be nothing that anyone could do to stop me if there's no permitting authority? If, I don't, I'm not going to stand here and concede, I cannot say that I can find the authority that would give us a way to stop that. Now that isn't to say that the government wouldn't want to try. I mean, the irony here is that NEMS wants to regulate these activities and I think they have a misguided and peculiar legal position, which is to put NEMS in a position that it cannot. The only case that they've come up with that talked about it, sort of a plenary injunctive authority, is the U.S. v. Wray case. And, you know, NEMS would not have authority to go seek an injunction. Of course, the Justice Department only has that authority. On top of it, U.S. v. Wray was an outrageous situation and there was statutory authority there. So it's not even dicta to say that there was this. I mean, this was a case where they were digging up the seabed, which they needed a Rivers and Harbors Act permit to do, and it was in a marine sanctuary and they were going to create a new nation with sovereign powers. So the Fifth Circuit, in a case that's now 42 years old, said besides the fact that you have authority to get an injunction on the Rivers and Harbors Act, we think there's sort of authority in the government to seek injunction for people who are digging up the seabed. What I would like to emphasize is the standing jurisprudence. And it does not matter for standing if we could stream up and be confident that there was a way that we could stop this without having permitting authority under the Magnuson Act. Because the law is quite clear on this point. If they're relying on something to happen, if they prevail, they have to show there's a likelihood. They can't say, well, you might dream up something. The burden is on them. Defenders of Wildlife says that. A case they cited in the reply brief, Levine v. Vilsack, says that. The burden is on them to show that the third party will do that. But, I mean, I understand their argument seems to me perfectly reasonable. They say that if we can knock out the permitting authority that you guys, that the service says exists, then this activity is not authorized, period. I don't know how you say it's not authorized if you do not require a permit for it under the Magnuson-Stevens Act. The EA was very clear there's no other permit for this kind of activity. Some kind of aquaculture may require a different kind of permit. This was not, you know, if they moored to the bottom of the ocean, they have to get a permit from the Corps of Engineers. If it's large enough that they are discharging, discharge is large enough over 100,000 pounds of product, then they would have to get a permit, a Clean Water Act permit from EPA. But this case is about this activity, and, you know, there is no other statutory hook that we are aware of that would have, you know, stopped these people from doing this without this permit. And, really, that's the question. I think that their theory relies on the council to take action. The council is not a federal agency and is not a party to this litigation. That is their theory, that the council would have to amend its plan to somehow do something to prohibit or, you know, this kind of activity. I mean, the fish presumably put out a fair amount of effluent, and they're not fish that are born there. Instead of importing them, they create – why isn't that – you were talking about what happens if you go in and have an activity that puts out a certain amount of – Well, the EPA has regulations on this, and they say that under 100,000 pounds you don't need a permit because, frankly, it's de minimis. I mean, this is very – I don't know how much effluent that many fish put out. Well, I'm not – To put the – It adds up quite a bit. Well, we're talking about 2,000 fingerlings here, and, you know, to put it – you know, apparently that's a really small amount of fish, really small amount of fish. I mean, you could pull in a net, and you would – it would be just a small, you know, percentage of a net. We're not talking volume here. And, you know, and I – I see. You know, the Magnuson Act doesn't – If it got big enough. If it got big enough, they would have to get a clean water permit, not from this particular defendant, but from the EPA. From the EPA, I see. That is in place. But we're talking about this project. There's nothing that we're aware of that's enacted that would allow, you know, a regulation or a statute to stop this kind of activity. And the, you know – Well, I won't belabor the standing point. The point is they would have to show that Kona Blue would not have gone forward if they didn't have any regulatory controls, which is highly unlikely, but it's their burden to show that they would have stopped if they didn't have to. But, frankly, the regulated community does not usually operate that way. And, secondly, they would have to show a likelihood that the council would take action. I mean, when I reread their briefs, the theory in the amicus brief was if this could – a swelling of public opinion that will make Congress act to do something to prohibit this. And I think, particularly this week, we can know that a public opinion is not necessarily going to propel Congress to act. And that is their burden to show a likelihood. And there's plenty of case law that says if you're dependent on congressional action, you don't have standing. I skipped you way ahead. I know you want to come back to the statutory interpretation argument. But on the NEPA claim, why is that claim moot under our case law? I'm sorry, why is it not moot? Why is it moot? Why is it moot? Okay. I will answer the question, but I did want to – to answer the question you asked, posing counsel, of why is the NEPA claim moot? Did we say the NEPA claim is moot? We didn't say the Magnuson-Stevens Act claim. It's because of our perspective. From our perspective, this activity requires a permit. If it requires a permit, NEPA has to be complied with. Okay? If their view of Magnuson Act were to prevail, you don't need a permit, then there's no NEPA requirement whatsoever.  So let's say we reject the NEPA. So that's why there's a difference. They're not parallel. I got you. Okay. So we're on the NEPA claim. We say that a permit was required and the service had authority to require that. I'm just thinking of our Alaska case where it seemed very similar. There was a one-year or, you know, a defined period for the permit to issue. By the time the case came to us, the time had run out. The permit had expired. And we said the argument was, hey, the NEPA claim is moot. The permit is over. What are you going to do? Make them go back and do the environmental assessment? The permit has expired. And we said, well, no, but somebody could come along and ask for the same kind of permit and, therefore, it's – and, you know, it would, again, be defined by just a year's period and it wouldn't be enough time to have it fully litigated. And we said, no, we're going to reach the merits because it's capable of repetition yet evading review. And it seems to me this is very similar to that case. It's similar, but it's different. And I'll tell you why I think it's different. I hope I'm thinking the same Alaska case that you're thinking of. I believe there's an Alaska case that involved permits for helicopters and national parks. Under this scheme, there's a special permit. A permit applicant comes in and there could be any range of gear that they might come in and ask for. And they are evaluated on a case-by-case basis. And you're going to have a different administrative record because these are permits that are being – I mean, these are activities that are being dreamed up by the private applicants. In the Alaska case, those were permits to operate in a national park and the same exact permit was issued year after year after year. There was no change. These were concessionaires. So I think that the difference here is that we don't know exactly what permits – it's a new review and it's going to have a different administrative record. And in the national park service case, it really – it was the same activity. So I think it was – But why can't – it seems to me a safe assumption that – since I gather this Kona Blue experiment was viewed as successful – that other people say, hey, what a great idea. Wish we had thought of that. Let's go get a permit for a year to drag some fish around in the ocean and then we can harvest them. It doesn't seem to me crazy that that's going to arise again. And it sounds to me as though the government's taken the position that at least if it's 2,000 fingerlings or less, there's just no – there's not enough of an impact. So just don't even bother going through the whole NEPA process. And why – okay, well, that issue could come up again. It would once again be – we wouldn't have enough time to fully resolve it before the permit expired. And so it just seems like we're right in the heartland of what Alaska is doing. Well, I think the court has to add two things. First, I want to correct the statement they said, which is that NEMCS has decided they're going to issue the second permit. They haven't decided anything about the permit. They're reviewing the permit. So there has been no decision to issue it. Secondly, if – you know, I guess a different way to look at it is, what good is it going to do to look at this NEPA record for the next permit? The – no one has come in and made this exact proposal to drag around the QPOD again. The new permit is – you know, the new proposal is somewhat similar, but the application is for a moored position. So, you know, so the fear that there's going to be more and more, you know, coming in, I don't think is proven out, at least at this point in time. I mean, I understand the dilemma when these are short-term permits, but truthfully much of the concern that they are expressing is about permanent facilities and long-term permits and so on, and obviously those won't be too short to review. And I would also point out that, you know, they might have to, you know, utilize trying to get expedited review in that district court or something like that. I mean, I understand the dilemma when they're short-term permits, but I do think this is not a situation where it's very predictable that each year there's going to be another one of these short-term permits, and I think that makes a difference. It's not like pregnancy. No. Or maybe it's like pregnancy, you can't be sure you'll have it next year. I'd like to engage. I don't want to go then, actually. What I'd like to bring you back to is the MSA and this harvesting, fishing, aquaculture lineage. Okay. What I'd like to say about that is that, you know, we're relying on a textual argument. You have a very broad definition of fishing in the MSA. That's catching, taking, and harvesting. And you also have, it's very clear, and so I dispute what you said, the MSA covers all fish. It certainly covers cultivated fish. It says any fish, and frankly, much of the harvested fish in this country are cultivated. I mean, hatcheries, Congress is well aware that hatchery fish are part of what would be managed under these fishery management plans. So both the definition of, and fish itself is not, is broadly defined to mean any living marine organism except for marine mammals and birds. So, you know, fishing isn't even sort of our vernacular. It's very broadly defined. So you have this broad definition. This, to me, is way in the main of what Congress was concerned about. The Magnuson-Stevens Act is primarily directed at regulating commercial fishing. This is a commercial operation. And in terms of the deference issue, I strongly disagree with the suggestion that somehow this is not a longstanding interpretation in something new. The general counsel memorandum are relevant and important because they are evidence of this longstanding interpretation. Since that 1993, it states unequivocally the agency's position that harvesting encompasses aquaculture facilities. They are misinterpreting that memorandum by saying, oh, but it says the council has to take further action on amended plans. That is not what it says. That memorandum was addressing a particular proposal in the Northeast to have an aquaculture facility. And after, you know, looking at the statutory interpretation, using the dictionary definition of harvest as a gathering of crop, it then addressed whether that particular proposal could take place under that particular fishing management plan. And they said it probably, they didn't say for sure, would need to be amended because they were going to harvest Atlantic salmon and that fishery management plan absolutely prohibited any harvest of Atlantic salmon. So they needed to open up an exception. We have a fishery management plan that does not prohibit harvest of this kind of fish and it has a specific provision, a special permit provision, for using new gear types that aren't listed. So we have a fishery management plan that can accommodate this, whereas that one did not. And that's all that means. There are other examples in both, you know, that we cite in our brief, and I'm out of time so I won't repeat those. But this is a longstanding interpretation. This is not something, it would be just completely out of the norm to go a different direction on this at this point. Okay, thank you. You have some rebuttal time left. Thank you, Your Honor. A minute, 46. Thank you, Your Honor. As far as the issue raised on the FM, the 1993 memo, counsel is correct that it dealt with an Atlantic salmon fishery. But it did say that if you're going to do this new aquaculture as fishing, you have to amend the fishery management plan. The fishery management plan here in Hawaii's counsel says that aquaculture is not fishing. It says that within the confines of the plan itself. And so they would have to amend it. Otherwise, they're going around it. They're constrained in their actions by the fishery management plan that comes out here in Hawaii. And what they've done is they've circumvented that. Number one, as far as standing goes, we don't need to show that Kona Blue would not operate again. All we need to show for regressibility is that there's been a change in legal status. The permit is the change in legal status. There was no permit before allowing aquaculture in the EEZ, and we're asking that that be the change. That's what we're asking to be redressed. It's not that we don't have to show that Kona Blue is not going to operate ever again. The defendants are saying that they could have operated prior or after, whether they're involved or not. And if we have to address it directly with Kona Blue, if there's no permit, at least there's no permit saying they're allowed to do it. Eighteen seconds left. Thank you very much. All right. Thank you. This case is signed and will stand submitted.
judges: Kozinski, Fisher, Watford